JAMES SKINNER & another *vs.* JOSEPH P. FLINT & another.

On the issue whether a sale of goods was induced by fraud of the buyer, evidence is admissible of a previous purchase by him of like goods from the same party, the terms of which were referred to and adopted in the sale in question.

In support of the proposition that a trader bought goods without intending to pay for them evidence is admissible that his shop was found closed and empty soon after the sale.

On an issue whether a purchase of goods from the plaintiff by a third person, and the subsequent purchase of them from him by the defendant, were in good faith, he testified, for the defendant, that the defendant paid him cash for the goods. *Held,* that it was competent for the plaintiff to cross-examine him as to what he did with the purchase money, without being bound by his answers; to prove alterations and erasures in entries on his books of account, to which he referred as setting forth his disbursements of it; and to contradict his statement of sums paid, by testimony of the persons to whom he testified that he paid them.

On the issue whether a purchase of goods in process of manufacture, from the shop of the manufacturer, immediately before his commencement of proceedings in bankruptcy, was made in good faith, he testified that he sold them for cash and without the purchaser's knowing of his financial condition. *Held,* that, as tending to contradict him and impeach his credit as a witness, the testimony of his workmen was competent, that, after the removal of the goods from the shop, he said that they might come back to be finished, and that, upon inquiry by the person from whom he himself bought the stock on credit, as to what he had done with it, he refused to give any information about it.

REPLEVIN of a lot of leather splits, to which the defendants claimed title by purchase from Peter Page. At the trial in the superior court, before *Brigham*, C. J., the plaintiffs sought to recover on the ground that they were the original owners of the splits ; that Page induced them to sell him the splits on February 6, 1868, by fraudulent pretences ; and that any transfer of title in the splits from Page to the defendants was with knowledge of the fraud, on their part.

The plaintiff Skinner testified, in the plaintiffs' behalf, that on January 11, 1868, Page proposed to buy a smaller lot of splits,

and, in reply to inquiries made by the witness, said that he was solvent, and that after currying and finishing splits, he consigned them to one Francis Tripp for sale, and Tripp thereupon ad vanced a check for their original cost upon them; that the wit- ness thereupon agreed to sell the lot to Page on condition that he should consign them to Tripp when finished, and give the plain- tiffs a check for the invoice; and that the sale was accordingly effected on a credit of thirty days, which was the time estimated to be needful to curry and finish splits. The defendants objected to this testimony; but the judge allowed it, upon a statement of the plaintiffs' counsel that they contended that this purchase was part of the fraudulent scheme, and expected to prove that it was referred to at the time Page bought the lot which was the subject of the action.

Skinner then testified, under the defendants' objection, that on February 6, 1868, Page came to him again, bringing Tripp's check for the amount of the invoice, and remarked that he should like to buy another lot of splits; that the witness asked if he wished to buy on the same conditions as before, and Page said that he did; and that thereupon the sale of the replevied splits was agreed on, and they were sent to Page the next day.

Skinner was further allowed to testify that on February 28, 1868, he went to Page's shop and found it closed and empty. The defendants objected to this testimony, on the ground that it applied to a time after their purchase of the second lot from Page; but the objection was overruled.

The defendants' evidence tended to show that they bought the second lot of splits from Page, in good faith and for their full value, on or before February 20, 1868, while he was finishing them; and they called Page as a witness, who testified that he bought them from the plaintiffs without fraud and uncondition- ally; that he sold them to the defendants for cash; and that the defendants had no knowledge of his financial condition or of the circumstances under which he obtained the splits from the plain- tiffs.

On cross-examination, the plaintiffs' counsel asked Page what he had done with the purchase money which he said that he re-

ceived from the defendants ; and he replied, naming certain sums as paid by him to his father and his lawyer, and said that he had also paid various sums to workmen, and could name the men and the amounts if he had his books. It had appeared, in course of the trial, that Page began proceedings in bankruptcy in the district court of the United States on or about February 20, 1868, and that Skinner was the assignee of his estate in bankruptcy. Skinner accordingly produced the books of account of the witness, and the witness turned to the entries concerning his father and several workmen, and proceeded to state from these entries what he paid to them. The plaintiffs' counsel then called his attention to erasures and alterations in these entries ; and he denied that the alterations were made by himself, but in each instance testified that the entry as altered was correct. He also testified, in cross-examination, that when he failed he had no assets of any kind, and was owing several thousand dollars. The whole of this cross-examination was conducted under objection of the defendants, and was allowed by the judge, who subsequently permitted the plaintiffs to put the books of account in evidence and to call the attention of the jury to the alterations and erasures.

The plaintiffs called several of Page's workmen, after he had testified ; and three of them, Matthew Cahill, Mark O'Neil and Luke Kelly were allowed to testify as follows, against the defendants' objection : Cahill testified that, after Page's sale of the splits to the defendants, and the removal of them from the shop, he asked Page what the workmen were going to do now that the stock was gone, and Page replied by asking him if he ever knew him to cheat his workmen, and saying that he had a right to sell his stock to whom he pleased, and that he did not know but that it might come back to the shop to be finished. O'Neil testified that, after the sale to the defendants, Page told him that the stock might come back again. Kelly testified, in reference to one of the altered entries on the books, in which he was charged with having been paid $40, and in reference to which Page had testified that he paid the witness $40, that in fact Page paid him only $20.

Skinner was also recalled by the plaintiffs, and was permitted to testify that on the 27th or 28th of February 1868, he went to Page's shop, and asked " what all this meant," and Page said that he had failed because Tripp refused to make any further advances ; and that then he asked Page what had become of his stock, and Page refused to tell him, or to give him any information about it. The defendants objected to this testimony, on the ground that Page had not been examined as to the conversation referred to.

The jury found for the plaintiffs, and the defendants alleged exceptions.

*D. Saunders,* (*C. G. Saunders* with him,) for the defendants.

*S. B. Ives, Jr.,* for the plaintiffs.

MORTON, J. The plaintiffs sold the replevied goods to one Page. The defendants claim title to them under a sale from said Page. The plaintiffs allege that Page purchased the goods by fraud, and with an intention not to pay for them. If this be so, they can avoid the sale and recover the goods, unless the defendants prove that they purchased them in good faith. *Easter* v. *Allen,* 8 Allen, 7. It thus appears that two issues are involved in the case: one, whether the sale to Page was induced by his fraud; the other, whether the defendants were innocent purchasers.

In order to decide intelligently the first issue, it is clear that the jury ought to know all the terms of the sale to Page, and all the circumstances attending it. The plaintiffs' testimony showed that, at the time of this sale, a previous purchase of the same kind of goods, made by Page, was referred to, and this sale was made upon the same conditions as the former. The former transaction was thus made a part of this sale, and evidence of it was properly admitted. Without such evidence, the jury could not fully understand the terms and character of the transaction under investigation.

The defendants objected to the testimony of one of the plaintiffs, that on the 28th of February he went to Page's shop and found it locked and empty. The court rightly admitted this testimony. The burden was on the plaintiffs to prove that Page

purchased the goods with an intention not to pay for them. The fact that, soon after the purchase, his shop was found closed and empty, if unexplained, had some tendency to show that his conduct was fraudulent; and was admissible in support of this issue. The fact that the defendants afterwards offered evidence tending to prove that they purchased the goods of Page, in good faith, before the 20th of February, would not, under the circumstances of this case, justify the court in excluding the testimony, or withdrawing it from the consideration of the jury, if the defendants had so requested. The defendants called Page as a witness, who testified that there was no fraud in his purchase of the plaintiffs, and that he sold the goods to the defendants in good faith, for cash. The testimony we are considering was thus made competent upon the additional ground that it tended to contradict Page.

We are of opinion that all the testimony, to which the other exceptions of the defendants apply, was properly admitted to contradict Page and impeach his credit. He testified that he sold the goods to the defendants for cash. It was proper to ask the witness, in cross-examination, what he had done with the money; and this inquiry was not in regard to a matter so entirely collat eral that the plaintiffs were bound by his answers. It was competent to contradict him on this point, and the erasures and alterations in his books, and the testimony of his workmen as to the amounts paid to them, were admissible for this purpose. The testimony of Page's workmen to the effect that he told them that the stock might come back to the shop, and of one of the plaintiffs, that Page refused to give him any information as to the stock, was admissible, as tending to contradict Page's testimony and to impeach his credit.                    *Exceptions overruled.*